# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

RESCAP LIQUIDATING TRUST,

           Plaintiff,

v.

U.S. BANK N.A. in its own capacity and as
successor to Firstar Finance, Inc.,

           Defendant.

Court File No. 16-cv-4067 (PAM/HB)

**FIRST AMENDED COMPLAINT**

Plaintiff ResCap Liquidating Trust ("Trust" or "Plaintiff"), by and through its attorneys, and as successor to Residential Funding Corporation, LLC ("RFC"), alleges for its First Amended Complaint against Defendant U.S. Bank N.A. ("U.S. Bank" or "Defendant"), both in its own capacity and as successor to Firstar Finance, Inc. ("Firstar"), as follows:

## NATURE OF ACTION

1.    This action concerns defective residential mortgage loans that U.S. Bank and Firstar sold to RFC.

2.    As alleged in further detail below, Exhibit A identifies, on a loan-by-loan basis by seller, specific contractual breaches in 212 loans U.S. Bank and Firstar sold to RFC (156 sold by U.S. Bank and 56 sold by Firstar) that were identified by performing an Automated Valuation Model ("AVM") and/or owner-occupancy analysis on these loans (the analysis is discussed further below). The loans with defects, as identified in these analyses, represent an astonishing 56.69% of the original principal balance of the

analyzed loans. Specifically, the loans sold by U.S. Bank to RFC had defects in 55.08% of the original principal balance and those loans sold by Firstar to RFC had defects in 62.08% of the original principal balance.

3.     The defective loans that U.S. Bank sold to RFC were involved in various lawsuits filed against RFC. These lawsuits were one of the factors that led to RFC filing for bankruptcy. During the bankruptcy, the defective loans that both U.S. Bank and Firstar sold to RFC also were involved in numerous proofs of claim filed against RFC in its bankruptcy. Sizeable sums have been paid out under RFC's confirmed chapter 11 plan to resolve these proofs of claim.

4.     RFC incurred massive liabilities and losses by virtue of the foregoing and other breaches, including during settlements in RFC's chapter 11 case, which is part of the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption *In re Residential Capital, LLC, et al.,* Case No. 12-12020 (MG). Defendant is legally and contractually responsible for the liabilities and losses caused by the poor quality of the mortgage loans it sold to RFC. Defendant is also legally responsible for the liabilities and losses caused by the poor quality of loans Firstar, its predecessor in interest, sold to RFC.

5.     RFC was, at times prior to its bankruptcy in May 2012, in the business of acquiring and securitizing residential mortgage loans.

6.     RFC's business model was built on acquiring loans from "correspondent lenders," such as U.S. Bank and Firstar, and distributing those loans by either pooling

them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan purchasers.

7.    Over the course of the parties' relationship, U.S. Bank and Firstar sold over 8,400 mortgage loans to RFC, with an original principal balance in excess of $561 million which were included in RMBS trusts for which liabilities were settled in the bankruptcy.  As alleged in greater detail below, numerous loans U.S. Bank and Firstar sold to RFC were defective.

8.    Critical to RFC's business success was the quality of the loans it purchased. To that end, RFC required its correspondent lenders, including U.S. Bank and Firstar, to abide by stringent loan-level contractual representations and warranties designed to protect RFC from the risks of borrower fraud, appraisal fraud, failure to comply with state and federal law, and other credit and compliance factors that could negatively impact the performance and value of the loans it purchased.

9.    During the course of RFC's business relationship with U.S. Bank and Firstar, RFC from time to time identified loans that contained material defects violating one or more of U.S. Bank's or Firstar's respective contractual representations and warranties.    Both U.S. Bank and Firstar acknowledged those material defects by repurchasing the loans or otherwise compensating RFC for the defects.  To the extent U.S. Bank or Firstar repurchased certain individual loans from RFC, RFC is not seeking to again recover the repurchase price as to those loans.  Moreover, U.S. Bank's or Firstar's repurchase of certain loans did not compensate RFC for all the liabilities and losses that RFC incurred due to U.S. Bank's or Firstar's sale of defective loans to RFC.

The parties' Agreements (as such term is defined below) entitle RFC to recovery of the additional liabilities and losses it incurred due to U.S. Bank's and/or Firstar's breaches.

10.    Ultimately, due in significant part to the failure of correspondent lenders, including U.S. Bank and Firstar, to honor their contractual representations and warranties, RFC was sued by numerous counterparties and investors in its RMBS, based on allegations that the loans contained numerous defects and were rife with fraud and compliance problems.

11.    By the time RFC and certain of its affiliates (collectively, the "Debtors") filed for bankruptcy in May 2012, RFC was facing over two dozen lawsuits around the country, all alleging that the loans RFC had securitized were defective, as well as claims by investors in hundreds of its RMBS seeking tens of billions of dollars in damages based on loan-level problems.

12.    During the bankruptcy cases, hundreds of proofs of claim were filed by dozens of claimants, including investors alleging securities fraud claims, class action plaintiffs, monoline insurers, RMBS holders and indenture trustees acting at their direction claiming breaches of representations and warranties, whole loan investors, and non-debtor co-defendants (such as underwriters of the RMBS offerings). Collectively, these claims alleged tens of billions of dollars of damages stemming from defective loans, including those sold to RFC by U.S. Bank and Firstar.

13.    Following a lengthy and intensive mediation presided over by then-sitting bankruptcy judge the Honorable James M. Peck, and related proceedings, RFC was able to resolve its RMBS-related liabilities for over $10 billion of allowed claims. This

agreed resolution of RFC's RMBS-related liabilities was set forth in a global settlement, which formed the cornerstone of a liquidating chapter 11 plan for RFC and its affiliated Debtors. On December 11, 2013, after a five-day confirmation trial, the Bankruptcy Court approved the global settlement finding it to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital LLC, et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"). Under paragraphs 24 and 48 of the *Order Confirming Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065], and Article IV of the Plan, the Trust is responsible for monetizing many of the Debtors' remaining assets and pursuing litigation claims—including RFC's rights against Defendant and other parties who sold mortgages to RFC—and distributing the proceeds to the Debtors' creditors.

14.     Defendant is contractually obligated to indemnify the Trust, as successor to RFC's rights under the Plan, for all liabilities and losses incurred by the Trust or RFC as a result of breaches of U.S. Bank's and Firstar's representations and warranties.

15.     Accordingly, the Trust brings this action for breach of contract and for indemnification of all liabilities and losses RFC or the Trust has incurred due to breaches by U.S. Bank and Firstar of their representations and warranties.

## PARTIES

16.    Plaintiff ResCap Liquidating Trust is a Delaware Statutory Trust created pursuant to the Plan.  The trustees of the ResCap Liquidating Trust are individuals who are citizens of New York, New Jersey, Connecticut, South Carolina, and California.  RFC is a Delaware limited liability company.  When it filed for bankruptcy, RFC was a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  RFC was formerly known as Residential Funding Corporation.  At the time it filed for bankruptcy, RFC was a wholly-owned subsidiary of GMAC-RFC Holding Company, LLC, a Delaware limited liability company.  GMAC-RFC Holding Company, LLC was a wholly-owned subsidiary of Residential Capital, LLC, a Delaware limited liability company.  Residential Capital, LLC was a wholly-owned subsidiary of GMAC Mortgage Group, LLC, a Delaware limited liability company, which in turn was a wholly-owned subsidiary of Ally Financial, Inc., a Delaware corporation with its principal place of business in Michigan.  Pursuant to the Plan, on December 17, 2013, GMAC-RFC Holding Company's interest in RFC was cancelled and in accordance with the Plan's terms, the Trust has now succeeded to all of RFC's rights and interests under RFC's Agreements with U.S. Bank and Firstar.

17.    Defendant U.S. Bank is a national banking association, chartered, regulated, and supervised by the Office of the Comptroller of the Currency ("OCC") with its principal place of business at 425 Walnut Street, Cincinnati, Ohio, 45202.  U.S. Bank sold loans directly to RFC and is successor to several other sellers of loans to RFC, including, but not limited to, Firstar.  With respect to Firstar, U.S. Bank became the

6

successor to Firstar pursuant to a January 10, 2003 letter agreement contractually assuming Firstar's obligations to RFC, as described further below.  Pursuant to that assumption, U.S. Bank assumed all legal liabilities for losses related to loans Firstar sold to RFC.  U.S. Bank, N.A. is also the successor to Firstar by virtue of a series of mergers. Specifically, on December 1, 2002, Firstar merged with U.S. Bancorp Consumer Finance of Kentucky, Inc., which was a Delaware corporation and the surviving corporation in that merger.  On September 30, 2005, U.S. Bancorp Consumer Finance of Kentucky, Inc. merged into ConFink, Inc., which was also a Delaware corporation.  On that same day, ConFink, Inc. merged into U.S. Bank, N.A.  By virtue of these mergers, U.S. Bank, N.A. is the successor to Firstar for all purposes.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, in that the matter arises under title 11 or arises in or is related to the Debtors' bankruptcy proceedings.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that the parties are citizens of different states and the amount in controversy exceeds $75,000.

19.     Venue is proper in this Court because the cause of action arose, in part, in Minnesota, the agreements at issue were to be performed, in part or entirely, in Minnesota, and the parties have contractually agreed that courts located in Minnesota are an appropriate forum.

## FACTUAL BACKGROUND

**The Agreements Between RFC and U.S. Bank and Firstar**

20.    Over the course of the parties' relationship, U.S. Bank and Firstar sold over 8,400 mortgage loans to RFC, which were then securitized into trusts for which liabilities were settled in the bankruptcy.

21.    Attached as Exhibit B is the seller contract pursuant to which U.S. Bank sold loans to RFC (the "U.S. Bank Contract").

22.    Attached as Exhibit C is the seller contract pursuant to which Firstar sold loans to RFC (the "Firstar Contract" and, together with the U.S. Bank Contract, the "Contracts").

23.    Attached as Exhibit D is the January 10, 2003 letter agreement (the "Assumption Letter") in which U.S. Bank expressly agreed to "assume full liability" for all "agreements, covenants, representations and warranties" made by Firstar to RFC "that in any way relate to or otherwise affect any loans sold by Firstar Finance to RFC."

24.    The Contracts incorporate RFC's standard terms and conditions for purchasing loans, frequently called the Client Guide (the "Client Guide").  A complete copy of the March 13, 2006 edition of the Client Guide is attached hereto as Exhibit E-1, a complete copy of the January 1, 2001 edition of the Client Guide is attached hereto as Exhibit E-2, and exemplary excerpts of other editions of the Client Guide are attached as Exhibits E-3 through E-27.  The complete versions of other editions are known to the parties and too voluminous to attach in their entirety.  The provisions of the Client Guide relevant to Plaintiff's claims were substantially similar during all periods relevant to this

8

Complaint, although the numbering of certain provisions changed between editions. The Contracts and Client Guide collectively form the agreements between RFC, on the one hand, and U.S. Bank and Firstar, on the other hand (the "Agreements"), and set the standards to which both U.S. Bank's and Firstar's loans sold to RFC were expected to adhere.

25.    A list of the at-issue loans (i.e., those with actual or expected losses which have not been repurchased) sold by U.S. Bank and Firstar to RFC pursuant to the Agreements, and subsequently securitized by RFC, is attached hereto as Exhibit F (the loans listed in Exhibit F were previously identified and disclosed in Plaintiff's original Complaint). The original principal balance of the loans listed in Exhibit F in aggregate exceeds $51.6 million.

26.    As correspondent lenders, both U.S. Bank and Firstar had the initial responsibility for collecting information from the borrower, verifying its accuracy, and underwriting the loan. U.S. Bank and Firstar had primary responsibility for all aspects of the underwriting of the loans each sold to RFC, and it was understood between the parties that RFC would generally *not* be re-underwriting the loan prior to purchase. It was U.S. Bank and Firstar, or others from whom they purchased mortgages, that actually closed the loans with the borrowers. In addition, under the Client Guide, U.S. Bank was obligated to audit "at least a 10% randomly selected sample of recently closed Loan inventory sold to GMAC-RFC and review the product within 90 days of its origination…" (March 13, 2006 Client Guide § 210(A)(2).) The same obligation was imposed on Firstar under the older editions of the Client Guide that govern the loans it

sold to RFC. (January 1, 2001 Client Guide 243(A)(2).) Accordingly, U.S. Bank and Firstar knew or should have known of the defects in the loans each sold to RFC.

27. Indeed, the Client Guide expressly adopts a broad definition of "knowledge," which includes constructive knowledge, and states that "any representation or warranty that is inaccurate or incomplete in any material respect is presumed to be made with the knowledge of [U.S. Bank], unless [U.S. Bank] demonstrates otherwise…." (March 13, 2006 Client Guide § 103(A).) Similarly, Firstar agreed to a broad definition of "knowledge" which states that "[a]ny representation or warranty that is inaccurate or incomplete in any material respect is deemed to be made with the knowledge of [Firstar], unless [Firstar] demonstrates otherwise." (January 1, 2001 Client Guide § 141(A).) U.S. Bank has a continuing obligation under Section A201(M) of the Client Guide to promptly notify RFC of any act or omission which might impact the loan, the Mortgaged Property, or the Mortgagor (as such terms are defined in the Client Guide). U.S. Bank has continually breached this obligation, including through to the present, by failing to inform RFC of the loan defects. Firstar had the same continuing obligation under Section A201(M) of the Client Guide. Likewise, Firstar breached this obligation until U.S. Bank succeeded to this obligation. U.S. Bank has continued to breach this obligation with respect to the loans sold by Firstar until the present.

28. As U.S. Bank and Firstar were well aware, once the loans were sold to RFC, RFC in many instances pooled groups of loans with similar characteristics, and the pool of loans would be sold into a special-purpose securitization trust. The pool of loans

formed the collateral underlying the trust's mortgage-backed securities, which were in turn sold to investors.

29.    U.S. Bank and Firstar knew of RFC's intention to securitize the loans. Specifically, U.S. Bank acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization," including all information necessary to comply with the disclosures required by Regulation AB (governing asset-backed securities) and other applicable federal securities laws.  (*See* March 13, 2006 Client Guide A202(II); 206(D).) Similarly, Firstar acknowledged, in the Client Guide, that it "recognize[d] that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]," and agreed to provide RFC with "all such information … as may be reasonably requested by [RFC] for inclusion in a prospectus or private placement memorandum published in connection with such securitization."  (*See* January 1, 2001 Client Guide A202(KK).)

30.    Pursuant to the Agreement with U.S. Bank, U.S. Bank made a number of representations and warranties with respect to all of the loans it sold to RFC, including, but not limited to, the following:

   a.    [U.S. Bank]'s "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (March 13, 2006 Client Guide A201(K).)

   b.    [U.S. Bank] "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify [RFC] of any

occurrence, act, or omission regarding [U.S. Bank], the Loan, the Mortgaged Property or the Mortgagor of which [U.S. Bank] has knowledge, which … may materially affect [U.S. Bank], the Loan, the Mortgaged Property or the Mortgagor." (March 13, 2006 Client Guide A201(M).)

c. "All information relating to each Loan delivered and sold to [RFC] is true, complete and accurate and there are no omissions of material facts. All data provided by the [U.S. Bank] to [RFC] relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file." (March 13, 2006 Client Guide A202(A).)

d. "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, are in recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to [RFC] have been so submitted, and are complete and accurate." (March 13, 2006 Client Guide A202(D).)

e. "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (March 13, 2006 Client Guide A202(D).)

f. "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to [RFC], and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [U.S. Bank] or any other entity involved in originating or servicing the Loan." (March 13, 2006 Client Guide A202(G).)

g. "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act. This warranty is made by [U.S. Bank] with respect to each [RFC] Loan Application taken and processed for each Loan and with respect to each Loan made by the [U.S. Bank] or any other entity." (March 13, 2006 Client Guide A202(I).)

h. "No Loan is a … loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or any other similar designation under any State or local law in effect at the time of the closing of the loan if the law imposes greater restrictions or additional legal liability for residential mortgage loans with high interest rates, points and/or fees." (March 13, 2006 Client Guide A202(J)(1)(d).)

i. "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could: (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan." (March 13, 2006 Client Guide A202(Q).)

j. "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide." (March 13, 2006 Client Guide A202(T).)

k. "For each Loan for which an appraisal is required or obtained under this Client Guide, the appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide." (March 13, 2006 Client Guide A202(T).)

l. "For each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is at least equal to the appraised value stated on the Loan appraisal, or if an Automated Valuation Model (AVM) is permitted, the Value on the AVM, except to the extent that the market Value of the Mortgaged Premises is lower … due to the effect of any toxic materials or other environmental hazards of which neither the appraiser nor the [U.S. Bank] has actual knowledge of reasonable grounds to suspect." (March 13, 2006 Client Guide A202(T).)

m. "No fraud or misrepresentation by the Borrower or by the [U.S. Bank], broker, correspondent, appraiser or any independent contractor retained by the [U.S. Bank], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to [RFC] in connection with the Loan are complete and accurate." (March 13, 2006 Client Guide A202(KK).)

31.     Similarly, pursuant to the Agreement with Firstar, Firstar made a number of representations and warranties with respect to all of the loans it sold to RFC, including, but not limited to, the following:

a.   [Firstar]'s "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business." (January 1, 2001 Client Guide A201(K).)

b.   [Firstar] "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify [RFC] of any occurrence, act, or omission regarding [Firstar], the Loan, the Mortgaged Property or the Mortgagor of which [Firstar] has knowledge, which … may materially affect [Firstar], the Loan, the Mortgaged Property or the Mortgagor." (January 1, 2001 Client Guide A201(M).)

c.   "All information relating to each Loan delivered and sold to [RFC] is true, complete and accurate and there are no omissions of material facts. All data provided by the [U.S Firstar] to [RFC] relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file." (January 1, 2001 Client Guide A202(A).)

d.   "All Loan Documents, Funding Documents and Final Documents are genuine, have been completed, duly and properly executed, recordable form and delivered in the form and manner specified in this Client Guide," and "[a]ll originals and copies of such documents and all other documents, materials, and other information required to be submitted to [RFC] have been so submitted, and are complete and accurate." (January 1, 2001 Client Guide A202(D).)

e.   "All Loan Documents, Funding Documents and Final Documents and all other documents describing or otherwise relating thereto are in compliance with all local and State laws, regulations and orders." (January 1, 2001 Client Guide A202(D).)

f.   "There is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to [RFC], and no event exists which, with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and no such default, breach, violation or event of acceleration has been waived by [Firstar] or any other entity involved in

14

originating or servicing the Loan." (January 1, 2001 Client Guide A202(G).)

g. "[E]ach Loan has been originated, closed, and transferred in compliance with all applicable local, State and federal laws and regulations including, but not limited to, the Real Estate Settlement Procedures Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Truth-in-Lending Act, the Fair Housing Act, and the National Flood Insurance Act. This warranty is made by [Firstar] with respect to each [RFC] Loan Application taken and processed for each Loan and with respect to each Loan made by the [Firstar] or any other entity." (January 1, 2001 Client Guide A202(I).)

h. "For 'high-cost,' 'high fee' Loans as defined in Regulation Z, Section 226.32 (Section 32 Mortgages), the Client specifically warrants that all Section 32 Mortgages have been accurately identified, that accurate disclosures have been provided to the consumer and to GMAC-RFC in accordance with Regulation Z, that the Section 32 Mortgages do not contain any prohibited terms as specified in Regulation Z, Section 226.32(d) and that the Client has not engaged in any prohibited acts and practices as specified in Regulation Z, Section 226.32(e). Representations and warranties made by the Client that Loans delivered for purchase are in compliance with any laws and regulations and are not subject to any defenses or set offs apply to Section 32 Mortgages regardless of any liability imposed on an assignees by the Truth-in-Lending Act and Regulation Z." (January 1, 2001 Client Guide A202(J).)

i. "[N]o circumstances exist involving the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that could: (i) cause private institutional investors to regard the Loan as an unacceptable investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value or marketability of the Mortgaged Premises or the Loan." (January 1, 2001 Client Guide A202(Q).)

j. "The Loan is of investment quality, has been prudently originated and has been underwritten in compliance with all requirements of this Client Guide." (January 1, 2001 Client Guide A202(T).)

k. "The appraisal was made by an appraiser who meets the minimum qualifications for appraisers as specified in this Client Guide." (January 1, 2001 Client Guide A202(T).)

15

l.  "No fraud or misrepresentation by the Borrower or by the [Firstar], broker, correspondent, appraiser or any independent contractor retained by the [Firstar], broker, correspondent, appraiser or any employee of any of the foregoing occurred with respect to or in connection with the origination or underwriting of any Loan and all information and documents provided to [RFC] in connection with the Loan are complete and accurate."  (January 1, 2001 Client Guide A202(MM).)

32.    These representations and warranties were material terms in RFC's agreement to acquire the mortgage loans from U.S. Bank and Firstar.  U.S. Bank's and Firstar's contractual warranty of the quality of the loans sold by them respectively was important because RFC in turn sold these loans to RMBS trusts and whole loan purchasers, making its own representations and warranties to the trusts and investors about the quality of loans that were based on warranties received from U.S. Bank or Firstar.  If any of U.S. Bank's or Firstar's representations and warranties turned out to be false, RFC could have exposure to these third parties, and thus, RFC required contractual protection from U.S. Bank or Firstar under which RFC would have recourse for its liabilities and losses on account of defective loans.

33.    Pursuant to the Client Guide, U.S. Bank's failure to comply with its representations and warranties or <u>any</u> of the other requirements, terms, or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true, accurate, and complete information in a timely manner.  (*See* March 13, 2006 Client Guide A208.)  Likewise, Firstar's failure to comply with its representations or warranties or any of the any of the other requirements, terms, or conditions of the Client Guide constitutes an "Event of Default," as does its failure to provide RFC with true,

16

accurate, and complete information in a timely manner. (*See* January 1, 2001 Client Guide A210.)

34.    Similarly, it is an "Event of Default" for U.S. Bank if a "[b]orrower or any other person or entity involved in the Loan transaction or its underwriting or documentation (including any appraiser, broker, third-party originator, credit reporting agency, or other provider of underwriting information) has made any false representation and/or has failed to provide information that is true, complete and accurate in connection with" the loan transaction, regardless of whether U.S. Bank knew of the misrepresentation or incorrect information. (*See* March 13, 2006 Client Guide A208.) An "Event of Default" would also occur if a borrower or other person involved in a Loan transaction did the same on a loan Firstar sold to RFC. (*See* January 1, 2001 Client Guide A210.)

35.    U.S. Bank expressly agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default. (*See* March 13, 2006 Client Guide A209(A).) Firstar also agreed that RFC was permitted to exercise any remedy "allowed by law or in equity" in connection with such Events of Default. (*See* January 1, 2001 Client Guide A220(A).) Moreover, the Client Guide specified that RFC's "exercise of one or more remedies in connection with a particular Event of Default will not prevent it from exercising … [o]ne or more other remedies in connection with the same Event of Default," or "[a]ny other rights which it may have at law or in equity." (*See* March 13, 2006 Client Guide A209(A).) RFC's remedies expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC

and U.S. Bank.  (*See* March 13, 2006 Client Guide A209(C).)  RFC's remedies also expressly survived the sale of the loans and the termination of the ongoing business relationship between RFC and Firstar. (*See* January 1, 2001 Client Guide A220(C).)  U.S. Bank and Firstar also respectively agreed that they were "liable for any misrepresentation or breach of warranty regardless of whether it or [RFC] actually had, or reasonably could have been expected to obtain, knowledge of the facts giving rise to such misrepresentation or breach of warranty."  (*See* March 13, 2006 Client Guide A200; January 1, 2001 Client Guide A200.)

36.    The Client Guide further specified the remedies available to RFC in case of an Event of Default, including a breach of any loan-level representation or warranty.  The available remedies included, but were expressly not limited to, repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against liabilities resulting from such breaches.  (*See* March 13, 2006 Client Guide A210; January 1, 2001 Client Guide A211.)  Further indemnification remedies are set forth in Sections A202 and A212 of the March 13, 2006 Client Guide and Section A224 of the January 1, 2001 Client Guide.  Section A209 of the March 13, 2006 Client Guide and Section A220 of the January 1, 2001 Client Guide, in turn, make clear that all of these remedies are non-exclusive and cumulative.

37.    Moreover, RFC alone retained the sole discretion to declare an Event of Default, and to choose what remedy or remedies to pursue.  Nothing in the Agreements required RFC to provide U.S. Bank or Firstar with notice and an opportunity to cure the defects, to make a repurchase demand, or in any way restricted RFC from pursuing

recovery for defective loans at any time.  In fact, the United States Court of Appeals for the Eighth Circuit has confirmed that, under the Client Guide, RFC has the sole discretion to declare an Event of Default, and correspondent lenders such as U.S. Bank and Firstar have contractually bargained away any right to challenge RFC's determination regarding such an Event of Default.  *See Residential Funding Co., LLC v. Terrace Mortg. Co.*, 725 F.3d 910 (8th Cir. 2013).

38.    One nonexclusive provision of the Client Guide permits RFC to recover for defective loans according to a formula that is based on the original principal balance of the loan.  If RFC determined that repurchase was not appropriate, U.S. Bank would nonetheless be contractually obligated to pay RFC "all losses, costs and expenses incurred by [RFC] and/or the Loan's Servicer as a result of an Event of Default," including "all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken."  (*See* March 13, 2006 Client Guide A210(A).)  Similarly, Firstar was also obligated if RFC determined that repurchase was not appropriate to pay RFC "all losses, costs and expenses incurred by [RFC] and/or the Loan's Servicer as a result of an Event of Default," including "all reasonable attorneys' fees and other costs and expenses incurred in connection with enforcement efforts undertaken."  (*See* January 1, 2001 Client Guide A221(C).)

39.    Under the terms of the Agreements, U.S. Bank and Firstar were obligated to repurchase loans and/or pay RFC the repurchase price even if the loan has already been foreclosed upon.  (*See* March 13, 2006 Client Guide A210(B); January 1, 2001 Client Guide A221(C).)

40.    U.S. Bank also expressly agreed to broad indemnification provisions, including the following:

> [U.S. Bank] shall indemnify [RFC] from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses … includ[ing], without limitation, liabilities arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client Contract, (iii) any claim, demand, defense or assertion against or involving [RFC] based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by [RFC] in reliance upon any warranty, obligation or representation made by [U.S. Bank] contained by the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by the [U.S. Bank] in information required under Regulation AB or any successor regulation.
>
> In addition, [U.S. Bank] shall indemnify [RFC] against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by [RFC] in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by [U.S. Bank], or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.

(March 13, 2006 Client Guide A212.)    Firstar also agreed to broad indemnification provisions:

> [Firstar] shall indemnify [RFC] from all losses, damages, penalties, fines, forfeitures, court costs and reasonable attorneys' fees, judgments, and any other costs, fees and expenses resulting from any Event of Default.    This includes any act or failure to act or any breach of warranty, obligation or representation contained in the Client Contract; or from any claim, demand, defense or assertion against or involving [RFC] based on or resulting from such breach or a breach of any representation, warranty, or obligation made by [RFC] in reliance upon any warranty, obligation, or representation made by [Firstar] contained in the Client Contract.

> [Firstar] shall also indemnify [RFC] and hold it harmless against all court costs, attorney's fees and another other costs, fees and expenses incurred by [RFC] in enforcing the Client Contract. The obligations of the Client under this Section shall survive the Delivery Date, the Funding Date (and each Substitution Date, if applicable) and the termination of the Client Contract and the disqualification or suspension of [Firstar].

(January 1, 2001 Client Guide A224.)  U.S. Bank and Firstar further agreed:

> to indemnify and hold [RFC] harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorneys' fees, judgment, cost, fee, expense or liability incurred by [RFC] as a result of any material misstatement in or omission from any information provided by [U.S. Bank or Firstar] to [RFC]; or from any claim, demand, defense or assertion against or involving [RFC] based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by [RFC] in reliance upon such misstatement or omission.

(March 13, 2006 Client Guide A202(II); January 1, 2001 Client Guide A202(KK).)  The

Client Guide also entitles RFC to recover all court costs, attorney's fees, and any other

costs, fees, and expenses incurred by RFC in enforcing the Agreements.  (March 13, 2006

Client Guide A212; January 1, 2001 Client Guide A224.)

41.    Additionally, prior to the commencement of this lawsuit, both U.S. Bank

and Firstar previously conceded that certain of the loans each sold to RFC were

materially defective.  In that regard, both U.S. Bank and Firstar have already paid

substantial sums to RFC to cover those defects.  In this action, Plaintiff is not seeking to

recover again on those sums. However, U.S. Bank's and Firstar's practice of

repurchasing and/or making RFC whole for defective loans demonstrates that each of

them was aware that it had problems with its underwriting on loans it sold to RFC, but

failed to comply with their ongoing obligation under Section A201(M) of the Client Guide to notify RFC of problems with other loans.

42.    RFC at all times performed all of its obligations to U.S. Bank and Firstar, if any, under the Agreements, and all conditions precedent to the relief sought in this action, if any, have been satisfied.

**U.S. Bank and Firstar Materially Breached Numerous Loan-Level Representations and Warranties.**

43.    As noted above, the loans RFC acquired from U.S. Bank, Firstar, and other correspondent lenders were in many instances sold into RMBS trusts that issued certificates to outside investors.

44.    Some of the loans that U.S. Bank and Firstar sold to RFC were eventually deposited in 119 RMBS trusts.  Out of these 119 trusts, 107 trusts had loans sold just by U.S. Bank, nine trusts had loans just sold by Firstar, and three trusts had loans sold by both U.S. Bank and Firstar.  When RFC sold the loans, it made representations and warranties to the trusts, and, as required by SEC regulations, disclosed pertinent information about the loans to investors in the RMBS.  In making those representations and warranties, RFC relied on information provided to it by U.S. Bank, Firstar, and other correspondent lenders.  In many cases, the information U.S. Bank or Firstar provided violated the representations and warranties they respectively provided to RFC.

45.    U.S. Bank and Firstar materially breached their extensive contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreements; did not meet the

representations and warranties made as to those loans; and/or failed to comply with applicable state and federal law.

46.    The Trust investigated U.S. Bank's and Firstar's representations and warranties about the appraised values backing some of the loans using an AVM.  Because of the ease of access to borrowers' tax records for more recent loans, the Trust also investigated U.S. Bank's representations regarding owner-occupancy for these loans (together, with the AVM analysis, the "Forensic Review").  Sufficient data existed to conduct this Forensic Review as to 467 loans U.S. Bank and Firstar sold to RFC that were subsequently securitized and experienced losses or which are expected to experience losses.  Because the Forensic Review examines information outside of a loan file, it can sometimes identify breaches that are not identified in a loan reunderwriting (likewise, for the reasons discussed below, reunderwriting can sometimes identify breaches that are not identified via Forensic Review).

47.    AVM is a tool in the mortgage industry that considers objective criteria such as the sale prices of comparable properties, previous surveyor valuations, historical house price movements and user inputs (number of bedrooms, property improvements, etc.) in the same locale as the subject property to determine the true market value of the property in question at a specific point in time.

48.    Using the same comparable sales data that would have been available to U.S. Bank and Firstar at the time of origination, the Forensic Review first conducted retroactive appraisals of the properties backing 467 loans U.S. Bank and Firstar sold to RFC that were subsequently securitized, have experienced losses, or are expected to

experience losses, and for which comparable sales data was available. The Forensic Review centered on three of U.S. Bank's and Firstar's core appraisal representations: (i) the market value of the mortgaged premises is at least equal to the appraised value stated in the loan appraisal (March 13, 2006 Client Guide A202(T); January 1, 2001 Client Guide A202(T)); (ii) no fraud or misrepresentation by the appraiser occurred in the origination of the loans and all information and documents provided to RFC in connection with the loans are complete and accurate (March 13, 2006 Client Guide A202(KK); January 1, 2001 Client Guide A202(TT)); and (iii) all data provided by U.S. Bank and Firstar to RFC relating to any loan is true and complete (March 13, 2006 Client Guide A202(A); January 1, 2001 Client Guide A202(TT)).

49.    For loans where sufficient comparison data was available, among other findings, the Forensic Review concluded that U.S. Bank had made the following misrepresentations concerning property values for loans it sold to RFC:

- 47.75% of the loans by original principal balance had reported property values overrepresented by more than 10%;

- 39.20% of the loans by original principal balance had reported property values overrepresented by more than 15%;

- 46.13% of the loans by original principal balance had reported loan-to-value ("LTV")[1] ratios underrepresented by more than 10%;

---

[1] The LTV ratio is a key measure of a borrower's likelihood to default. The LTV ratio expresses the amount of the mortgage loan as a percentage of the appraised value of the property. For example, if a borrower borrows $80,000 to buy a house worth $100,000, then the LTV ratio is $80,000/$100,000, or 80%—the remaining $20,000 of the house's value reflects the borrower's 20% equity stake in the house. A combined-loan-to-value ratio (or "CLTV" ratio) expresses the amount of all of the loans secured by a property as a percentage of the appraised value; that is, it accounts for any additional liens. The

- 37.94% of the loans by original principal balance had reported LTV ratios underrepresented by more than 15%;

- 18.50% of the loans by original principal balance had reported LTV ratios underrepresented by more than 25%; and

- 31.23% of the loans by original principal balance had actual LTV ratios greater than 100% (i.e., the loans were "underwater" at origination).

50.    For loans where sufficient comparison data was available, among other findings, the Forensic Review concluded that Firstar had made the following misrepresentations concerning property values for loans it sold to RFC:

- 62.08% of the loans by original principal balance had reported property values overrepresented by more than 10%;

- 59.27% had reported property values overrepresented by more than 15%;

- 62.08% had reported LTV ratios underrepresented by more than 10%;

- 57.39% had reported LTV ratios underrepresented by more than 15%;

- 24.84% had reported LTV ratios underrepresented by more than 25%; and 54.25% of the loans by original principal balance had actual LTV ratios greater than 100% (i.e., the loans were "underwater" at origination).

51.    All of these findings establish breaches of at least the following representations U.S. Bank and Firstar made to RFC: (A), (T), and (KK) of Section A202 of the March 13, 2006 Client Guide and (A), (T), and (MM) of Section A202 of the January 1, 2001 Client Guide, which provide that (a) all information delivered with respect to each loan was true correct and accurate; (b) that the fair market value of the

---

AVM review used CLTV in analyzing second-lien loans.  A borrower with a sizable equity stake in a property has more to lose than a borrower with a small stake; thus, a borrower with a large equity position has financial incentives not to default and lose his or her equity.  Conversely, a borrower with little or no equity stake in a property has little financial incentive to avoid default.

property was greater than the appraisal; and (c) there was no fraud or misrepresentation on the part of any appraiser. The Forensic Review demonstrates that defects are pervasive throughout the pools of loans both U.S. Bank and Firstar sold to RFC.

52.    The Forensic Review also investigated U.S. Bank's representation that 197 of the loans U.S. Bank sold to RFC that were securitized and later experienced losses or are anticipated to experience losses were backed by owner-occupied properties.   A property is said to be "owner-occupied" when the borrower has made the property his or her primary residence, as opposed to a vacation home or investment property.   When a property is not in fact owner-occupied, the borrower is more likely to default, which in turn increases the riskiness of the mortgage loan.   Borrowers who live in mortgaged properties are known to be less likely to "walk away" from those properties and default on their mortgage obligations than borrowers who buy residential properties as investments or vacation homes.

53.    The Forensic Review examination on owner-occupancy centered on U.S. Bank representations that: (i) all information provided to RFC relating to each loan is true, complete, and accurate, and there are no omissions of material facts (March 13, 2006 Client Guide A202(A)); (ii) there is no default, breach, violation, or event of acceleration existing under any mortgage note (March 13, 2006 Client Guide A202(G)); and (iii) there was no fraud or misrepresentation by the borrower, broker, or U.S. Bank in the origination of the loan (March 13, 2006 Client Guide A202(KK)).

54.    The Forensic Review ran two tests to determine the accuracy of U.S. Bank representations as to the owner-occupancy of the properties collateralizing the loans sold

to RFC. The first test investigated where the borrower had his or her tax bills sent. It is reasonable to expect that a borrower residing at a property would have his or her tax bills sent to that address. If a borrower had his or her tax bills sent to another address, the owner-occupancy review regarded that as evidence that the borrower did not actually reside at the mortgaged property. The second test assessed whether the borrower made certain tax exemptions based on the property. If a borrower declined to make these tax exemption elections that depend on the borrower living at the property, that also is strong evidence the borrower was living elsewhere. If a loan failed both of these tests, the owner-occupancy review identified a breach of representations (A), (G), and (KK) of Section A202 of the Client Guide, which provide that (a) all information provided to RFC relating to each loan is true, complete and accurate; (b) there is no default, breach, violation or acceleration existing under any mortgage note; and (c) there was no fraud on the part of the borrower, broker or U.S. Bank in the origination of the loan. Of the analyzed loans, over 6.9% by original principal balance failed the owner-occupancy tests and therefore breached representations (A), (G), and (KK) of Section A202 of the Client Guide.

55.    In total, the Forensic Review indicated that loans with an original principal balance totaling 56% of the original principal balance reviewed contained at least one defect. Of the U.S. Bank loans, loans with an original principal balance of 55.08% of the overall original principal balance contained a defect. Of the Firstar loans, loans with an original principal balance of 62.08% of the overall original principal balance contained a defect. A schedule identifying the defective loans detected by the Forensic Review,

whether U.S. Bank or Firstar sold the loan, and the findings connected with those loans is attached as Exhibit A.

56.     Because the Forensic Review only examines the property value and owner-occupancy representations for a given loan, it is not uncommon for an AVM analysis to provide a lower breach rate for a group of loans than a reunderwriting review of a sample of loans from that population.   The reason for this is that the reunderwriting review covers the full scope of loan representations and warranties—such as those dealing with income, employment status, and credit history—instead of just the property value and occupancy representations examined in the Forensic Review.   In certain cases the Forensic Review may find a higher breach rate than a reunderwriting review because the Forensic Review uses external information to detect misrepresentations regarding value and owner-occupancy representations which may not be detectable from just reviewing the materials in a loan file.

57.     Apart from the Forensic Review, internal reviews conducted by RFC determined that many of the loans U.S. Bank and Firstar sold to RFC violated the Client Guide and/or other representations or warranties made by U.S. Bank and Firstar in various other ways, resulting in Events of Default under the Agreements.

58.     The types of defects varied, but included employment misrepresentation (a violation of Client Guide A202(A), (G), (T)), undisclosed debt (a violation of Client Guide A202(KK)), and appraisal problems (a violation of Client Guide A 251-T, (T)), among others.   These defects demonstrate that additional material defects exist throughout the loan population sold to RFC by U.S. Bank and Firstar.   Indeed, a number

of the loans defaulted very shortly after origination (constituting Early Payment Defaults

or EPDs), which is widely recognized in the industry as often signaling fraud or other

problems in the origination and underwriting of the loans.

59.     By way of example, RFC identified the following defects in loans sold by

U.S. Bank or Firstar which were later securitized:

a.  Loan ID # 9974179 sold by U.S. Bank to RFC (included in securitization 2005-HS1) in the amount of $23,200 with a fund date of June 29, 2005.  The borrower on this loan failed to disclose that he or she had incurred substantial additional indebtedness in the gap between applying for the loan and the closing.  Under the Client Guide, U.S. Bank was responsible for monitoring and checking for such debts.  The additional indebtedness meant this loan was riskier than represented by U.S. Bank.  This credit misrepresentation breached the Client Guide including, without limitation, Section A202 (KK) of the April 1, 2005 Client Guide, No Fraud or Misrepresentation.  U.S. Bank acknowledged the problems with this loan and repurchased it.

b.  Loan ID # 9111629 sold by U.S. Bank to RFC (included in securitization 2004-QS10) in the amount of $348,000 with a fund date of June 28, 2004.  This loan was made to a property speculator and involved multiple misrepresentations.  The speculator had purchased three investment properties within a six month period.  The asset information in the loan file was falsified.  The appraisal was also falsified.  Not only was it dated the same day as the purchase contract was signed, but it also failed to note the property had been gutted and used two invalid comparison properties.  In addition, between the making of the loan application and the loan closing, the borrower entered into two additional mortgages and a car loan that added $4,309 to the borrower's monthly debt service.  The combination of the misrepresentations regarding the value of the property and the borrower's debt load made this loan far riskier than represented by U.S. Bank.  These misrepresentations should have been detected if U.S. Bank properly underwrote the loan.  This misrepresentation breached the Client Guide including, without limitation, Section A202 (KK) of the April 1, 2004 Client Guide, No Fraud or Misrepresentation. U.S. Bank acknowledged the problems with this loan and repurchased it.

c.  Loan ID # 4117597 sold by Firstar to RFC (included in RAMP 2001-
RS1) in the amount of $44,250 with a fund date of December 28, 2000.
This loan was part of a fraud scheme involving undisclosed property
churning. The property also had 11 undisclosed mortgages. These
misrepresentations made the loan far riskier than represented by Firstar.
These misrepresentations should have been detected if Firstar properly
underwrote the loan. This misrepresentation breached the Client
Guide, including, without limitation, Section 251-1(A) of the June 1,
2000 Client Guide, Loans are Eligible; Accuracy of Information. Firstar
acknowledged the problem with this loan and repurchased it.

d.  Loan ID # 4275503 sold by Firstar to RFC (included in RASC 2001-
KS1) in the amount of $62,000 with a fund date of February 28, 2001.
This loan had a misrepresented property value in connection with a bad
appraisal. This misrepresentation made the loan far riskier than
represented by Firstar and should have been detected if Firstar properly
underwrote the loan. This misrepresentation breached the Client
Guide, including, without limitation, Sections A202(A) of the January
1, 2001 Client Guide, Loans are Eligible Accuracy of Information;
A202(6) of the January 1, 2001 Client Guide, Underwriting; Appraisal;
Appraiser; and A202(MM) of the January 1, 2001 Client Guide, No
Fraud or Misrepresentation. Firstar acknowledged the problem with
this loan and indemnified RFC for the losses suffered on it.

e.  Loan ID # 4638846 sold by Firstar to RFC (not included in a
securitization for which claims were settled in the bankruptcy) in the
amount of $89,600 with a note date of March 21, 2001. Firstar failed to
verify employment of the borrower before closing. As a result, it
missed that the borrower had left his job prior to closing. This lack of
employment and the associated employment misrepresentation made
the loan far riskier than represented by Firstar and should have been
detected by Firstar reverifying employment. The misrepresentation
breached the Client Guide, including, without limitation, Sections
A202(A) of the January 1, 2001 Client Guide, Loans are Eligible
Accuracy of Information; and A202(MM) of the January 1, 2001 Client
Guide, No Fraud or Misrepresentation.

f.  Loan ID # 3978531 sold by Firstar to RFC (not included in a
securitization for which claims were settled in the bankruptcy) in the
amount of $78,200 with a fund date of December 1, 2000. The
borrower for this loan had not disclosed a new car loan for over
$24,000. When the payments on this loan were included in the
borrower's DTI, the DTI was impermissibly high. Firstar should have

caught this undisclosed debt based on recent inquiries listed on the borrower's credit report.  In addition, Firstar failed to properly document the buyer's income, the comparables included in the appraisal were distant from the property, and all had greater living area than the subject property, which calls into question the accuracy of the appraisal.  These misrepresentations breached the Client Guide, including, without limitation, Sections 251-1(A) of the June 1, 2000 Client Guide, Loans are Eligible; Accuracy of Information; and 251-(T) of the Client Guide, Underwriting; Appraisal; Appraiser.

The above examples are not intended to be an exhaustive list of the loans sold by U.S. Bank and Firstar to RFC that contained material breaches of representations and warranties.  Rather, these loans represent a sample of the defects found in the loans U.S. Bank and Firstar sold to RFC.  Many more of the loans sold to RFC by U.S. Bank and Firstar contained material defects that violated the representations and warranties it made in the Agreements.

60.    On the basis of the foregoing, and pursuant to Section A209 or A210 of the Client Guide, Plaintiff has determined that at least the loans referenced in paragraph 59 above and Exhibit A hereto contain defects and were sold by U.S. Bank and/or Firstar to RFC in violation of the Agreements.  Plaintiff hereby declares an Event of Default under the Client Guide based on those breaches for any loan that has not been repurchased or fully satisfied.  Additional material defects are likely contained throughout the loan population sold to RFC by U.S. Bank and/or Firstar.

**RFC's Liabilities and Losses Stemming from U.S. Bank's and Firstar's Breaches.**

61.    As a direct result of U.S. Bank's and Firstar's breaches, RFC has incurred obligations, liabilities, damages, and losses for which it is entitled to recovery from Defendant.

62.     First, RFC has incurred billions of dollars in liabilities and losses stemming from defective loans, including those sold to RFC by U.S. Bank and/or Firstar.

63.     In addition, RFC has expended tens of millions of dollars litigating the quality of the loans sold to it by U.S. Bank and others in extensive federal and state court litigation in which the plaintiffs claimed the loans were rife with borrower or originator fraud, or failed to comply with applicable state and/or federal law.

64.     Specifically, beginning in 2008 and continuing until RFC filed for bankruptcy protection with the Bankruptcy Court on May 14, 2012, RFC faced a growing number of claims and dozens of lawsuits stemming from the defective loans sold to it by Defendant and other correspondents.

65.     For example, a number of the RFC-sponsored RMBS offerings containing loans sold to RFC by U.S. Bank became the subject of more than a dozen lawsuits brought by investors and other participants in the securitizations.  The plaintiffs in these cases alleged that as many as 88% of the loans contained in the at-issue RMBS offerings were defective in one or more ways.

66.     The first of these lawsuits was filed by bond insurer MBIA in October 2008.  The MBIA lawsuit covered five RFC second-lien securitizations that included thousands of mortgage loans.  For the first time, RFC learned that MBIA's analysis had concluded that over 80% of the loans in the pools it insured were defective.

67.     The MBIA lawsuit specifically attacked RFC's RMBS offerings 2006-HSA4, 2006-HSA5,  2007-HSA1, 2007-HSA2, and 2007-HSA3, which contained over 790 loans sold by U.S. Bank.

68.    Indeed, as part of the MBIA litigation, MBIA hired an expert to review again a sampling of loans across the five securitizations involved in the *MBIA v. Residential Funding Company, LLC* case.  Even in a relatively small sample of loans reviewed, MBIA's expert reviewed 16 loans sold by U.S. Bank to RFC.  No less than 15 of these loans were identified as breaching the weaker representations and warranties that RFC gave to MBIA.  Many of these loans were identified as having multiple breaches. Seven of the loans had appraisals which did not meet the requirements of the Client Guide.  Four loans were made to borrowers whose debt-to-income ratio exceeded the requirements in the Client Guide.   Three loans were made where the CLTV ratio exceeded the requirements in the contract guide.  In eight cases, U.S. Bank failed to properly verify a borrower's housing history in accordance with the requirements of the Client Guide.  Other types of breaches also existed within the 16 loans.

69.    The MBIA lawsuit was followed shortly thereafter by a class action suit filed by the New Jersey Carpenters pension funds.

70.    The New Jersey Carpenters' lawsuit purported to cover 59 mortgage-backed securities offerings issued through RFC's RALI shelf in 2006 and 2007, which consisted of first-lien Alt-A loans.  These securitizations were identified by names that included the letters "QA," "QH," "QO," and "QS."  Over 30 loans sold by U.S. Bank were included in the offerings that were the subject of the New Jersey Carpenters' lawsuit.

71.    The New Jersey Carpenters' complaint alleged that 38% of the mortgage loans underlying the securitizations were in delinquency, default, foreclosure, or

repossession when the complaint was filed, and that much of RFC's mortgage loan data "was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting" described throughout the complaint. NJ Carpenters' First Am. Compl. ¶¶ 9, 110 in *New Jersey Carpenters et al. v. Residential Capital, LLC, et al.*, Case No. 08-cv-08781 (HB) (S.D.N.Y.). Of course, that data was provided to RFC—and represented and warranted to be accurate—by U.S. Bank and other correspondent lenders.

72.     On February 18, 2011, the Allstate Insurance Company and its various subsidiaries and affiliates ("Allstate") sued RFC and numerous other parties in Hennepin County District Court, Minnesota. Allstate sued RFC for its role in 23 securitizations, seven of which included in the aggregate over 1,400 loans sold to RFC by U.S. Bank. Allstate supported its allegations in the complaint with a forensic review of over 30,000 loans to determine owner-occupancy status and property valuations. For each of the eight securitizations U.S. Bank sold loans into, Allstate reviewed a sample of 800 defaulted loans and 800 loans tested at random, unless a particular securitization contained less than 800 loans—in which case Allstate reviewed all of the loans in that securitization. Allstate alleged that its review of these loans showed significant misstatements concerning owner-occupancy rates and loan-to-value ratios, both of which U.S. Bank was responsible for reviewing under the Client Guide.

73.     In the fall of 2011, the Financial Guaranty Insurance Corporation ("FGIC") started filing lawsuits against the Debtors related to securitizations it had underwritten. On November 29, 2011, FGIC filed an action against RFC and other parties asserting

claims relating to the 2005-HS1 and 2005-HS2 securitizations, which in aggregate contained over 600 loans sold by U.S. Bank to RFC. FGIC supported its allegations in this complaint with, among other things, the results of a review of the owner-occupancy rates and LTV ratio representations for the securitizations supported by a review of over 18,000 loans using an automated-valuation-tool. This review found significant misstatements with respect to the representations in the transaction documents concerning owner-occupancy and LTV ratios. RFC would have made these representations in reliance on U.S. Bank and other correspondents providing it truthful information concerning the loans.

74. On December 27, 2011, FGIC filed an action against RFC and other parties asserting claims relating to the 2005-HSA1, 2006-HSA1, and 2006-HSA2 securitizations, which, in aggregate, contained 382 loans sold by U.S. Bank to RFC. FGIC supported its allegations in this case with a forensic reunderwriting of certain loan files it was able to obtain. According to the complaint, FGIC's consultant found breaches in approximately 69% of the 2005-HSA1, 60% of the 2006-HSA1, and 59% of the 2006-HSA2 loan files that were reviewed. FGIC also supported its allegations with the results of a review of the owner-occupancy rates and LTV representations in the securitizations supported by a review of over 11,000 loans using an automated-valuation tool. This review found significant misstatements with respect to the representations in the transaction documents concerning owner-occupancy and LTV ratios. RFC made these representations in reliance on U.S. Bank and other correspondents providing it truthful information concerning the loans.

75.     Numerous other lawsuits followed on through RFC's bankruptcy filing in 2012, including over 15 lawsuits brought by private investors in its RMBS securities, and more than a dozen lawsuits brought by monoline insurers.

76.     All of these lawsuits alleged that the loans RFC sold into RMBS securitizations were defective in a variety of ways, including because of borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy rates, or failure to comply with applicable state and federal law.

77.     Collectively, these lawsuits involved more than 100 RMBS securitizations and loans with a combined original principal balance of more than $100 billion.

78.     Across the dozens of securitizations involved in these lawsuits, U.S. Bank was responsible for over 1,890 of the loans.

79.     As of May 2012, RFC had already repurchased millions of dollars worth of defective loans from its RMBS securitizations and whole loan purchasers, either at the request of a bond insurer, trustee, or whole loan purchaser, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loan.  As described in more detail above, these included numerous loans sold to RFC by U.S. Bank.

80.     In May 2012, the Debtors—partly because of the enormous exposure stemming from the pending mortgage-related lawsuits described above—filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York.

81.    In connection with the bankruptcy proceeding, hundreds of proofs of claim were filed by investors in RMBS, monoline insurers, whole loan purchasers, indenture trustees, and an array of co-defendants in the above-described loan-related litigation. These proofs of claim, many of which mirrored the litigation filed prior to the bankruptcy, sought damages in the tens of billions of dollars, all stemming from allegedly defective mortgage loans, including those sold to RFC by U.S. Bank and Firstar.  By way of example, the following represents a small sampling of the hundreds of proofs of claim filed on the basis of defective loans:

    a.  The indenture trustees for each of the RFC-sponsored securitizations (Deutsche Bank, Bank of New York, U.S. Bank, HSBC Bank, Law Trust, and Wells Fargo) collectively filed more than two dozen proofs of claim at the direction of two substantial groups of institutional investors.  The institutional investors collectively asserted that loan-level defects (including in the loans sold to RFC by U.S. Bank and Firstar and securitized) were responsible for more than $19.5 billion in repurchase obligations.

    b.  AIG, an investor in 33 Debtor-sponsored securitizations (a number of which included U.S. Bank loans), filed five proofs of claim totaling in excess of $2.6 billion, based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

    c.  Allstate, an investor in 23 Debtor-sponsored securitizations (a number of which included U.S. Bank loans), filed 20 proofs of claim, based on the allegation that the loans were defective.  The proofs of claim were based in part on analyses of the individual loan-level data for these loans.

    d.  John Hancock, an investor in 52 Debtor-sponsored securitizations (a number of which included U.S. Bank loans), filed 43 proofs of claim asserting similar allegations.

    e.  Prudential, an investor in 28 Debtor-sponsored securitizations (a number of which included U.S. Bank loans), filed 31 proofs of claim asserting similar allegations.

     f.  FGIC, a monoline insurer that issued financial guaranty insurance on a number of RFC-sponsored securitizations that included U.S. Bank loans, filed three proofs of claim seeking approximately $1.85 billion in damages based on alleged defects contained in the loans, a number of which FGIC had individually reviewed.

82.    Many whole loan purchasers also filed proofs of claim in the bankruptcy proceedings, collectively seeking millions of dollars in recovery.

83.    These proofs of claim, lawsuits, and demands all alleged, among other things, that the securitized or purchased loans were defective, improperly underwritten, and breached representations and warranties made by RFC to investors, purchasers, and other contractual parties. Those representations and warranties were made based on the representations and warranties that RFC had received from U.S. Bank and Firstar, and on which RFC had relied. In many instances, creditors asserted claims against both RFC and against other Debtors based on the same losses.

84.    The Debtors initially proposed to settle portions of their RMBS-related liabilities for an aggregate $8.7 billion allowed claim in the bankruptcy cases. Subsequently, after protracted litigation over the reasonableness and propriety of that settlement, the Bankruptcy Court appointed the Honorable James M. Peck, then a United States Bankruptcy Judge for the Southern District of New York, to serve as a mediator and to attempt to achieve a negotiated resolution of the Debtors' RMBS-related liabilities and of other disputed issues in the chapter 11 cases. A lengthy mediation process ensued, which together with related proceedings, resulted in a global settlement that, among other things, provided for the resolution of *all* of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims granted to the various RMBS trusts, monoline

insurers, FHFA, securities law claimants, and others.  The manner in which multi-Debtor claims were settled varied:  (a) Article IV.C.3 of the Plan, together with Schedules 2-R and 3-R thereto, allow RMBS trustee claims and allocate these claims on an RMBS-by-RMBS basis; (b) Article IV.D of the Plan allows monoline insurer claims, but on a basis and in a manner that is different from RMBS trustee claims; and (c) the largest securities claims were resolved through a separate settlement trust or a single cash payment.  Each of these settlements involved claims being asserted against RFC based on defective loans sold to it by U.S. Bank, Firstar, and other correspondents.

85.    The Bankruptcy Court for the Southern District of New York ultimately approved the global settlement—including the $10 billion-plus settlement of RMBS-related liabilities—finding the settlements to be fair and reasonable and in the best interests of each of the Debtors, and confirmed the Plan.  (*See* Findings of Fact ¶¶ 98-176, Case No. 12-12020-MG (Bankr. S.D.N.Y.) [D.I. 6066]).  The Plan became effective on December 17, 2013.

86.    Pursuant to its express contractual obligations, Defendant is obligated to compensate RFC for the portion of the global settlement associated with its breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses (including the tens of millions of dollars that RFC has paid in attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with those breaches.  Under the Plan, the Trust has succeeded to RFC's rights to assert these claims.

## COUNT ONE
## (BREACH OF CONTRACT)

87.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 86, above, as if fully rewritten herein.

88.    RFC entered into valid and enforceable Agreements with both U.S. Bank and Firstar pursuant to which RFC acquired over 8,400 mortgage loans from U.S. Bank and Firstar that were later securitized.  U.S. Bank also entered into a January 10, 2003 letter agreement with RFC in which U.S. Bank expressly agreed to "assume full liability for the making and performance of all agreements, covenants, representations and warranties made by Firstar Finance, Inc. in favor of RFC that in any way relate to or otherwise affect any loans sold by Firstar Finance, Inc. to RFC."  *See* Ex. D.

89.    Pursuant to the parties' Agreements, U.S. Bank and Firstar made representations and warranties to RFC regarding the quality and characteristics of the mortgage loans U.S. Bank and Firstar sold to RFC.

90.    RFC complied with all conditions precedent, if any, and all of its obligations under the Agreements.

91.    U.S. Bank and Firstar materially breached their respective representations and warranties to RFC inasmuch as the mortgage loans materially did not comply with the representations and warranties.

92.    U.S. Bank's and Firstar's material breaches constitute Events of Default under the Agreements.

93.    RFC has suffered loss, harm, and financial exposure directly attributable to U.S. Bank's and Firstar's material breaches, including liabilities and losses stemming from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated with both defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by U.S. Bank and Firstar, and fees and costs incurred in prosecuting this action.

94.    Under the Plan, Plaintiff has succeeded to RFC's rights against U.S. Bank and Firstar under the Agreements.

95.    Accordingly, Plaintiff is entitled to compensation in an amount to be proven at trial, which exceeds $75,000, together with an award of attorneys' fees, interest, and costs.

## COUNT TWO
## (INDEMNIFICATION)

96.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 95 above, as if fully rewritten herein.

97.    RFC has incurred substantial liabilities, losses and damages arising from and relating to material defects in the mortgage loans U.S. Bank and Firstar sold to RFC and U.S Bank's and Firstar's alleged breaches of representations and warranties made to RFC, including over $10 billion in allowed claims approved by the United States Bankruptcy Court for the Southern District of New York, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with

defending dozens of lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by U.S. Bank and Firstar.

98.    U.S. Bank and Firstar expressly agreed to indemnify RFC for the liabilities, losses, and damages, including attorneys' fees and costs, which RFC has incurred.

99.    Under the Plan, Plaintiff has succeeded to RFC's rights against U.S. Bank and Firstar under the Agreements.

100.    Accordingly, Plaintiff is entitled to indemnification in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs.

WHEREFORE, Plaintiff demands judgment in its favor and against U.S. Bank, in its own capacity and as successor to Firstar, as follows:

(A)    On Count One (Breach of Contract), contractual repurchase compensation and/or damages in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(B)    On Count Two (Indemnification), a declaratory judgment that U.S. Bank, in its own capacity, and as successor to Firstar, is responsible to indemnify Plaintiff against liabilities, losses, expenses, and/or other damages paid or to be paid by RFC or Plaintiff in settlements or otherwise stemming from U.S Bank's and Firstar's conduct; an order for damages sufficient to reimburse Plaintiff for the liabilities, losses, costs, and expenses caused by U.S. Bank's and Firstar's actions in excess of $75,000 and in an amount to be proven at trial, and an award of attorneys' fees, interest, and costs; and

(C)    All such further relief, as the Court deems necessary or proper.

Dated:  July 5, 2017

FELHABER LARSON                           CARPENTER LIPPS & LELAND LLP

By:    /s/ Jessica J. Nelson                      Jeffrey A. Lipps (admitted *pro hac vice*)
    Donald G. Heeman, #286023              Jennifer A.L. Battle (admitted *pro hac vice*)
    Jessica J. Nelson, #347358             Michael N. Beekhuizen (admitted *pro hac vice*)
    220 South Sixth Street, Suite 2200     280 Plaza, Suite 1300
    Minneapolis, MN  55402-4504            280 North High Street
    Telephone:  (612) 339-6321             Columbus, Ohio 43215
    Facsimile:  (612) 338-0535             Telephone:  (614) 365-4100
    dheeman@felhaber.com                   Facsimile:  (614) 365-9145
    jnelson@felhaber.com                   lipps@CarpenterLipps.com
                                           battle@CarpenterLipps.com
                                           beekhuizen@CarpenterLipps.com

*Attorneys for Plaintiff ResCap Liquidating Trust*